IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DAVID E. BLACKMORE, | |
| Plaintiff, | 8:21CV318 |
| vs. | |
| UNION PACIFIC RAILROAD COMPANY, a Delaware corporation; | MEMORANDUM AND ORDER |
| Defendant. | |

## I. INTRODUCTION

This case arises out of the injuries Plaintiff, David E. Blackmore, suffered during a railcar accident while working for Defendant, Union Pacific Railroad Company ("Union Pacific"). Blackmore filed suit against Union Pacific under the Federal Employers' Liability Act ("FELA"), 42 U.S.C. § 51 et seq. The parties cross-move for partial summary judgment. Filing No. 61; Filing No. 62. For the reasons set forth herein, the Court denies Blackmore's motion for summary judgment and grants in part and denies in part Union Pacific's motion for summary judgment.

## II. BACKGROUND

David Blackmore worked for Union Pacific as a switchman. Filing No. 1 at 1. On September 25, 2020, Blackmore was assigned the job of "kicking" cars at Union Pacific's Neff Yard located in Kansas City, Missouri, in an area of the yard known as the "West Bowl." Filing No. 1 at 2; Filing No. 64-2 at 4. Kicking cars entails using a locomotive to sort cars onto different tracks. Filing No. 64-6 at 25. In order to kick a car, the foreman aligns the locomotive to the proper track with the car to be kicked attached, starts the locomotive up to speed, pulls the uncoupling lever to uncouple the car, and then brakes

1

the locomotive so that only the car then proceeds to roll onto the correct track. Filing No. 64-6 at 25. On September 25, Blackmore was part of a two-person crew where he worked as the foreman and William Hilton worked as his helper. Filing No. 64-2 at 4. The crew was charged with picking up a set of railcars from Track 60 and then sorting them into different West Bowl tracks. Filing No. 64-2 at 4–5; Filing No. 64-4. Blackmore and Hilton were assigned engine UP 669, a four-axle engine. Filing No. 64-5 at 35; Filing No. 64-3 at 5. Hilton inspected UP 669 before starting to switch cars to ensure it was within its daily inspection window and conducted a brake test. Filing No. 64-2 at 14. Once they began their switching operations, Blackmore was on the ground operating the engine by remote control while Hilton was in the cab of the locomotive in order to keep a look out when the locomotive went in reverse. Filing No. 64-5 at 39.

Blackmore testified that he was attempting to kick a railcar by the name of MBLX 53912 onto track 65 at the time of his injury. Filing No. 64-5 at 33–34. According to Blackmore, he accelerated the locomotive but did not know what speed it reached and then pulled the car's pin-lifter to release it from the locomotive. Filing No. 64-7 at 4–6. However, the car did not immediately release, and Blackmore had to jiggle the pin lifter to attempt to "pop it loose." Filing No. 64-7 at 4. Blackmore continued to move alongside the train while attempting to loosen the pin-lifter but fell and went underneath the car where his lower left leg was run over. Filing No. 64-7 at 4–9. Blackmore testified the car ultimately uncoupled after he fell. Filing No. 64-7 at 2. Blackmore does not know exactly what caused him to fall. Filing No. 64-7 at 7. He described it as "a feeling of being pulled over." Filing No. 64-7 at 8. Blackmore ultimately had to have his leg amputated below the knee. Filing No. 64-5 at 13; Filing No. 64-7 at 12.

After Blackmore was run over by the train, Union Pacific conducted an investigation of the accident site and the involved equipment. Filing No. 64-6 at 5–9. According to Ryan Curtis, Union Pacific's Superintendent of Terminal Operations, a car was still coupled to the locomotive after Blackmore was injured. Filing No. 64-6 at 3, 25. Based on the positioning of the cars and locomotive after the accident, Union Pacific concluded that Blackmore had already kicked the MBLX car onto track 65 and was in the process of kicking car CRDX 11843 onto track 60 when he was injured. Filing No. 64-9 at 9, 16; Filing No. 64-6 at 20, 25.

Blackmore's expert witness, Howard Foster, inspected the CRDX coupler, including dismantling it so its internal parts could be examined. Filing No. 64-8 at 6. Foster agreed Blackmore was kicking the CRDX car rather than the MBLX car at the time of his accident based on the testimony of Union Pacific officials and photographs taken after the accident. Filing No. 64-8 at 3–5. According to Foster, the CRDX coupler showed "excessive wear marks on the internal coupler parts." Filing No. 64-8 at 6. Foster opined that "[w]orn coupler internal parts can and will cause a coupler to be inoperative." Filing No. 64-8 at 7. Foster's opinion was that "[t]he likely reason that the uncoupling lever failed to open the knuckle was due to a defective coupler lock and/or knuckle thrower account being worn excessively." Filing No. 64-8 at 12.

In contrast, Union Pacific presented evidence that Blackmore was traveling at an excessively fast speed for kicking cars on the day in question. According to Curtis, UP 669 was set to go at a maximum speed of 15 mph when being operated remotely. Filing No. 64-6 at 8. In contrast, Blackmore testified he believed the locomotive's top speed was only 10 mph when under remote control. Filing No. 64-2 at 10. The locomotive read

3

out indicated the train was going slightly over 10 mph at the time of the accident. Filing No. 64-6 at 21. Curtis testified that this speed was too fast for kicking cars and that a safe speed for kicking cars is between 4 and 7 mph. Filing No. 64-6 at 25. Union Pacific's director of Optimization and Operations, Marvin Kohles, agreed that 4 to 7 mph is an appropriate kicking speed and Blackmore was operating UP 669 at too fast of a speed on the day of his accident. Filing No. 64-9 at 11. Union Pacific's expert, Torrence Welch, opined that, based on the bruising present on Blackmore's back after the accident, his injury was caused by him operating the train car at too fast a speed and "fouling" (or getting too close to) the tracks, resulting in the train car knocking him under the train. Filing No. 78-3 at 28–29.

There was also discussion of the ground conditions at the location of Blackmore's injury. Filing No. 64-2 at 8–12. Blackmore testified that he believed his fall was caused in part by tripping over an abrupt drop off near the railroad crossing where his injury occurred. Filing No. 64-7 at 24. Blackmore's coworker Hilton also stated he had reported to Union Pacific's safety hotline that there were "poor walking conditions and stumbling hazards" in the West Bowl. Filing No. 64-2 at 9. The local union chairman, Mike Moberly, had also expressed concerns about unsafe walking conditions in the West Bowl to Union Pacific officials. Filing No. 64-2 at 12–13; Filing No. 76-7 at 3. Moberly testified that there were uneven walking conditions and a "hump" in the West Bowl that made kicking cars dangerous. Filing No. 76-7 at 2–3. Plaintiff's expert, Brandon Ogden, agreed that there was debris and an abrupt drop off in the area where Blackmore fell which played a role in Blackmore being unable to keep his footing. Filing No. 62-5 at 4–5; Filing No. 76-8 at 2–3.

Lastly, Blackmore testified that he believed UP 669 was underpowered for the kicking job he was performing that day. Filing No. 64-5 at 35. Blackmore's expert, Ogden, agreed the locomotive was underpowered. Filing 62-5 at 4. While Ogden admitted UP 669 had sufficient power to kick railcars, he opined it was nevertheless "not the proper locomotive or horsepower to use in kicking operations." Filing No. 62-5 at 3. Ogden stated, "What I'm saying is that a double set, six-axle locomotives [sic] have substantially more power and that they allow for when a remote control operator selects a speed, those locomotives react very much differently than a single 2000 horsepower locomotive in kicking operations." Filing No. 62-5 a5 3. In contrast, Union Pacific's expert, Bryan Sooter, opined that UP 669 had enough power for the kicking operation that day. Filing No. 78-2 at 31.

Blackmore brought suit against Union Pacific pursuant to the Federal Employers' Liability Act, alleging Union Pacific was responsible for his injury for violation of various safety statutes and for negligence. *See generally* Filing No. 1. The parties now cross-move for partial summary judgment.

## III.   ANALYSIS

### A. Standard of Review

Summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "an adverse party cannot produce admissible evidence to support" a fact essential to the nonmoving party's claim. Fed. R.

5

Civ. P. 56(c)(1)(A) & (B). The plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The movant 'bears the initial responsibility of informing the district court of the basis for its motion, and must identify 'those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Celotex*, 477 U.S. at 323). If the movant does so, "the nonmovant must respond by submitting evidentiary materials that set out 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). A "genuine" issue of material fact exists "when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The evidence must be viewed in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *Kenney v. Swift Transp., Inc.*, 347 F.3d 1041, 1044 (8th Cir. 2003). "In ruling on a motion for summary judgment, a court must not weigh evidence or make credibility determinations." *Id.* "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *Koehn v. Indian Hills Cmty. Coll.*, 371 F.3d 394, 396 (8th Cir. 2004). If "reasonable minds could differ as to the import of the evidence," summary judgment should not be granted. *Anderson*, 477 U.S. at 251.

6

B. FELA

The Federal Employers' Liability Act ("FELA") provides the exclusive remedy for a railroad employee injured as a result, in whole or in part, of his or her employer's negligence. 45 US.C. § 51; *see, e.g.*, *Wabash R. Co. v. Hayes*, 234 U.S. 86, 89 (1914). Substantively, FELA actions are governed by federal law. *Norfolk Southern Ry. Co. v. Sorrell*, 549 U.S. 158, 165 (2007).

The FELA is construed liberally to further its remedial and humanitarian purpose. *Urie v. Thompson*, 337 U.S. 163, 181–82 (1949). "Under the FELA, '[a] railroad will be liable if its or its agent's negligence played any part, *even the slightest*, in producing the employee's injury.'" *Miller v. Union Pac. R.R. Co.*, 972 F.3d 979, 984 (8th Cir. 2020) (emphasis in original) (quoting *Ybarra v. Burlington N., Inc.*, 689 F.2d 147, 149 (8th Cir. 1982)). "FELA's language on causation . . . 'is as broad as could be framed.'" *Id.* (quoting *CSX Transp., Inc. v. McBride*, 564 U.S. 685 (2011)).

"Under FELA, an employer's 'fault may consist of a breach of the duty of care . . . or of a breach of some statutory duty.'" *Id.* (quoting *Kernan v. Am. Dredging Co.*, 355 U.S. 426, 432 (1958). If a plaintiff proves a railroad violated a statutory duty, then the plaintiff need not prove the common law elements of foreseeability, duty, or breach. *Id.* (citing *Edwards v. CSX Transp. Inc.*, 821 F.3d 758, 760 (6th Cir. 2016). "Moreover, a violation of a safety statute 'creates liability under FELA . . . without regard to whether the injury flowing from the breach was the injury the statute sought to prevent.'" *Id.* (quoting *Kernan*, 355 U.S. at 433). "Thus, 'a railroad's violation of a safety statute . . . is negligence per se.'" *Id.* (quoting *McBride*, 564 U.S. at 703 n.12).

7

At issue in the present motions are Blackmore's allegations of negligence per se under the FELA predicated on the violation of three different statutes: the Safety Appliance Act ("SAA"), 49 U.S.C. § 20301 et seq.; the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701; and Mo. Rev. Stat. § 389.797 relating to walkways alongside railroad tracks. The Court will address these three theories of liability in turn and concludes genuine disputes of material fact preclude summary judgment as to Blackmore's claims under the SAA and Mo. Rev. Stat. § 389.797. Union Pacific is entitled to summary judgment on Blackmore's LIA claim.

### C. FELA Liability Predicated on Violation of the Safety Appliance Act

The parties cross-move for summary judgment as to Blackmore's negligence per se action predicated on violation of the SAA. Blackmore also argues that he is entitled to summary judgment that Union Pacific's violation of the SAA caused his injury, and that Union Pacific may not assert contributory negligence as a defense to his claims. Union Pacific argues there is no evidence that it violated the SAA and even it did, there is no evidence that any alleged violation caused Blackmore's injury. The Court finds the facts are disputed, thereby precluding summary judgment on the SAA claim.

The Safety Appliance Act imposes an absolute duty on railroad carriers to provide certain safety equipment on their trains. *See* 49 U.S.C. § 20301 et seq. Blackmore claims Union Pacific violated section 2 of the SAA which provides in relevant part, "[A] railroad carrier may use or allow to be used on any of its railroad lines . . . a vehicle only if it is equipped with . . . couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles . . . ." 49 U.S.C. § 20302(a)(1)(A).

8

To recover for a violation of the SAA pursuant to the FELA, Blackmore must show "(1) the statute was violated; and (2) the violation was 'a causative factor contributing in whole or in part to the accident' that caused h[is] injuries." *Grogg v. Missouri Pac. R. Co.*, 841 F.2d 210, 212 (8th Cir. 1988) (quoting *Beimert v. Burlington N., Inc.*, 726 F.2d 412, 414–15 (8th Cir. 1984) (per curiam)). To prove the coupler violated the SAA, Blackmore can "show either evidence of 'some particular defect, or the same inefficiency may be established by showing a failure to function, when operated with due care, in the normal, natural, and usual manner.'" *Id.* (quoting *Myers v. Reading Co.*, 331 U.S. 477, 483 (1947)).

Blackmore argues there is undisputed evidence of both a particular defect and a failure to function of the coupler.

1. *Evidence the Pin Lifter Suffered a Specific Defect*

Blackmore argues the pin lifter on the coupler suffered a specific defect in that his expert, Foster, opines it had suffered excessive wear which likely contributed to the coupler being inoperative. Union Pacific does not present evidence to dispute that the coupler showed wear. Instead, it argues that excessive wear cannot be a specific defect for purposes of the SAA because it is not a violation of a separately defined regulation, like those promulgated by the Federal Railroad Administration ("FRA"). Filing No. 62-1 at 12. However, the SAA does not require a violation of a separate regulation in order to violate its coupler provision. *See generally* 49 U.S.C. § 20302. However, even if that were the case, Foster opined the excessive wear rendered the coupler "inoperative," Filing No. 64-8 at 7, which is a violation of the FRA regulation defining a defective coupler. *See* 49 C.F.R. § 215.123 (defining defective coupler to mean, inter alia, one whose

9

knuckle pin is "inoperative"). Union Pacific's argument that excessive wear cannot be a specific defect under the SAA is therefore without merit.

Next, Union Pacific argues that excessive wear alone cannot violate the SAA because Blackmore was not also required to go between the cars in order to perform the uncoupling. Union Pacific premises this argument on the language of the SAA coupler provision which states requires railcars to be equipped with "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles." 49 U.S.C. § 20302(a)(1)(A). Union Pacific argues that a coupler must fail both prongs of this statute (automatic coupling/uncoupling and the necessity of individuals going between the ends of the vehicles) in order to violate the SAA. This is an illogical reading of the statutory language. The statute puts forth two separate requirements that a railroad carrier must meet. Should a rail carrier fail to meet one of these requirements, it has failed to comply with the SAA. By Union Pacific's reasoning, a railroad could have couplers that do not couple or uncouple, thereby putting their employees at risk, but not be in violation of the safety statute.

Union Pacific points to the history of the statute as arising out of prior railroad technology which required railroad workers to go frequently go between cars and the fact that the comma between "uncoupled" and "without" was added at a later date to clarify that both the coupling and uncoupling must be automatic. *See Norfolk & W. Ry. Co. v. Hiles*, 516 U.S. 400, 407 & n.10 (1996) ("[W]e clarified that the statute should be read as though there were a comma after the word "uncoupled," so that the words "without the necessity of men going between the ends of the cars" applies to both coupling and

uncoupling. When Congress recodified the SAA in 1994, it placed a comma behind the word "uncoupled."). But these points about the statute's purpose and history do not support its arguments that both prongs of the statute must be breached before an SAA violation can be declared. The language of the statue is plain on its face and requires that a rail carrier provide cars capable of automatic coupling/uncoupling *and* which do not require employees to go between the cars. Other courts have similarly concluded that a rail carrier violates the SAA's coupler provision by virtue of non-functioning couplers, even without the necessity of the employee physically going between cars. *See, e.g.*, *S. Pac. Co. v. Mahl*, 406 F.2d 1201, 1204 (5th Cir. 1969) ("[T]he failure of a coupler to uncouple due to a defect therein is sufficient to establish liability under the Safety Appliance Act, regardless of whether it was necessary for the employee to go between the ends of the cars. Stated another way: In order to establish that the coupler was defective, proof of the necessity of going between the cars is not required."); *Phillips v. Chesapeake & O. Ry. Co.*, 475 F.2d 22, 25 (4th Cir. 1973) ("The Safety Appliance Act imposes liability for defective uncoupling devices whether or not the railroad employee is going between cars to uncouple them when he is injured."); *Bohannon v. Kansas City S. Ry. Co.*, No. CV 21-805, 2022 WL 1664072, at *3 (W.D. La. May 24, 2022) ("Bohannon need not show he went between the cars in order to uncouple them. Rather, the failure of a coupler to uncouple due to a defect therein is sufficient to establish liability under the SAA." (internal quotation marks and citations omitted)).

While Union Pacific's statutory arguments regarding whether excessive wear is an SAA violation fail, there is nevertheless a dispute of material fact as to whether the excessive wear on the coupler device caused Blackmore's injury which precludes

11

summary judgment. While Foster argued the excessive wear resulted in the pin lifter failing to uncouple and causing Blackmore to fall as he moved alongside the train jiggling the pin lifter, Union Pacific's expert, Welch, opined that the sole cause of Blackmore's injury was his kicking cars at an excessive speed and fouling the tracks. *See* Filing No. 78-3 at 28–29. Therefore, according to Union Pacific's evidence, the pin lifter, even if defective, played no "part, even the slightest" in Blackmore's accident for purposes of FELA liability. *Miller*, 972 F.3d at 984 (emphasis omitted).

Additionally, there is conflicting evidence in the record regarding which specific pin lifter may have failed to function on the day in question. Blackmore testified adamantly that he was uncoupling the MBLX car when his accident occurred. Filing No. 64-5 at 33–34. However, Union Pacific determined, due to the cars' positioning after the incident, that Blackmore had already uncoupled the MBLX car and was in fact attempting to uncouple the CRDX car when he went under the train. Filing No. 64-9 at 9, 16; Filing No. 64-6 at 20, 25. Based on this determination, Blackmore's expert Foster examined the internal workings of only the pin lifter on the CRDX car, not the MBLX car. Therefore, it is unclear which pin lifter may have been the one to allegedly contribute to Blackmore's injury and whether that pin lifter suffered from excessive wear or not.

These disputed facts preclude summary judgment to either party on Blackmore's FELA claim premised on the SAA.

*2. Evidence the Pin Lifter Failed to Function as Intended*

Blackmore also argues for SAA liability because the pin lifter failed to function when operated with due care in the normal, natural, and usual manner. *Grogg*, 841 F.2d at 212. He points to his undisputed testimony that the pin lifter did not immediately

12

release, and he was forced to jiggle it repeatedly. However, the evidence is disputed regarding whether Blackmore was attempting to operate the pin lifter during the kicking operation in the normal, natural, and usual manner.

While Blackmore testified that he was kicking cars as he normally would, Union Pacific put forth evidence that Blackmore was operating the locomotive at a speed that was too fast for safely kicking cars. *See, e.g.*, Filing No. 64-6 at 25 (Curtis opining 4 to 7 mph is a safe speed for kicking cars while Blackmore was operating UP 669 at more than 10 mph); Filing No. 64-9 at 11 (Kohles agreeing 4 to 7 mph is appropriate kicking speed); Filing No. 78-3 at 28–29 (Defendant's expert Welch opining Blackmore caused the accident by operating the train at too fast a speed and fouling the tracks).

Because there is a dispute of material fact regarding whether Blackmore was operating the pin lifter with due care in the normal, natural, and usual manner, summary judgment is not appropriate to either party.

*3. Blackmore's Remaining Arguments Regarding the SAA*

Blackmore also argues he is entitled to summary judgment that Union Pacific's violation of the SAA was the cause, in whole or in part, of his injury. Because the Court finds disputed facts preclude summary judgment regarding whether Union Pacific violated the SAA, it cannot grant summary judgment saying any such violation was the cause of Blackmore's injury.

Blackmore also argues he is entitled to summary judgment that Union Pacific may not assert contributory negligence as a defense to his SAA claim. While Blackmore is correct that contributory negligence is not a defense to a FELA action and instead reduces the amount of damages a plaintiff may recover, 45 U.S.C. § 53, this is merely a correct

recitation of the law, not a question of fact which requires the granting of summary judgment.[1] As such, Blackmore's request for summary judgment on that point is denied as unnecessary.

### D. FELA Liability Predicated on Violation of the Locomotive Inspection Act

Union Pacific next moves for summary judgment on Blackmore's claim that its violation of the Locomotive Inspection Act caused his injury for purposes of FELA liability.

The Locomotive Inspection Act ("LIA") provides, as relevant here, that "[a] railroad carrier may use or allow to be used a locomotive . . . only when the locomotive . . . and its parts and appurtenances . . . are in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). "The LIA has the 'purpose and effect of facilitating employee recover[y]' by conferring on railroads a 'duty to provide safe equipment.'" *BNSF Ry. Co. v. Seats, Inc.*, 900 F.3d 545, 546 (8th Cir. 2018) (alteration in original) (quoting *Urie v. Thompson*, 337 U.S. 163, 188-89 (1949)).

Blackmore claims the locomotive he was using that day, UP 669, violated the LIA because it failed to react to the remote-control device he was using, and it was "underpowered and unsafe" for kicking cars. As to the failure to respond, there is no evidence in the record that the locomotive did not respond to the remote-control device, even Blackmore's own testimony. He apparently concedes this, not addressing this claim in his brief. See Filing No. 75 at 30–33. Thus, Union Pacific is entitled to summary judgment on this claim.

---

[1] The Court also does not read Union Pacific's briefing as asserting contributory negligence as a bar to recovery. Rather, Union Pacific argues at times that Blackmore's own actions were the *sole* cause of his accident. *See, e.g.*, Filing No. 62-1 at 13 (arguing that "[a]ny alleged SAA violation did not cause Plaintiff's injury"). Should Union Pacific attempt to assert such a defense it would be precluded from doing so by the FELA as set forth above.

As to UP 669 being underpowered, the only evidence on this point is testimony from Blackmore and Ogden that, in their view, a four-axle engine like UP 669 lacked the power to effectively kick cars in the West Bowl because it could not accelerate to kicking speed or brake quickly enough. Even taking these opinions to mean the locomotive was underpowered as opposed to merely less efficient for the task, however, there is no evidence that UP 669 being a four-axle engine caused any issues that day or, most importantly, played any role in causing Blackmore's injury. Blackmore's own testimony was that he felt he was being "pulled over" after having difficulty uncoupling the cars. Filing No. 64-7 at 8. He does not fault or explain how UP 669's allegedly being underpowered could have caused him to go under the train car that day. In fact, he focuses on the issues with the coupler, not with any problem accelerating or decelerating the locomotive. Additionally, none of Blackmore's experts cite the fact UP 669 was a four-axle engine as being a cause, however small, of Blackmore's injury. Thus, there is no dispute of fact that any LIA violation that may have existed was not a cause of Blackmore's injury, and Union Pacific is entitled to summary judgment on this claim.

E. **FELA Liability Predicated on Violation of Mo. Rev. Stat. § 389.797**

Lastly, Union Pacific moves for summary judgment on Blackmore's FELA claim based on its purported violation of Missouri law.

Missouri Revised Statute § 389.797 states that any railroad doing business in the state "shall keep and maintain those margins alongside their tracks, where railroad employees are required to walk in the course of their duties, reasonably free from debris, vegetation and any hazards known or which should have been known to exist, which affect the safety of such employees." Mo. Rev. Stat. § 389.797. Blackmore claims Union

15

Pacific violated this safety statute because there was an uneven surface, debris, and a three-inch drop at the crossing near where he fell.

Blackmore testified that he believed his fall was caused in part by tripping over the abrupt drop off near the railroad crossing where his injury occurred. Filing No. 64-7 at 24. Moberly and Hilton testified that they had reported tripping hazards in the West Bowl. Filing No. 64-2 at 9; Filing No. 64-2 at 12–13; Filing No. 76-7 at 3. Blackmore's expert Ogden also testified that there was debris and an abrupt drop off in the area where Blackmore fell which played a role in Blackmore being unable to keep his footing. Filing No. 62-5 at 4–5; Filing No. 76-8 at 2–3. In contrast, Defendant's expert, Welch, testified that the sole cause of the accident was Blackmore operating the locomotive at too fast a speed and fouling the tracks. Filing No. 78-3 at 28–29. There is therefore a dispute of fact as to whether there was "debris [or] any hazards" along the tracks that violated Mo. Rev. Stat. § 389.797 and the role such hazards played in causing Blackmore's injury. Accordingly, summary judgment is not appropriate on this point.[2]

## IV. CONCLUSION

For the foregoing reasons, neither party is entitled to summary judgment on Blackmore's claim for FELA liability under the Safety Appliance Act. Union Pacific's motion for summary judgment on Blackmore's claim under the Locomotive Inspection Act is granted but its motion for summary judgment as to Blackmore's claim under Missouri Revised Statute § 389.797 is denied.

---

[2] Union Pacific has also filed a motion to strike Ogden's testimony. Filing No. 66. Because the Court concludes that evidence other than Ogden's testimony—namely Blackmore, Hilton, and Moberly's statements—creates a dispute of material fact for purposes of summary judgment, it need not address the motion in limine at this time and will do so by separate order.

17

IT IS ORDERED:

1. Plaintiff's, David E. Blackmore's, Motion for Partial Summary Judgment, Filing No. 61 is denied; and

2. Defendant's, Union Pacific Railroad Company's, Motion for Partial Summary Judgment, Filing No. 62, is granted as to Blackmore's FELA claim under the Locomotive Inspection Act but denied as to the remaining claims.

Dated this 12th day of December.

                                                BY THE COURT:

                                                s/ Joseph F. Bataillon
                                                Senior United States District Judge